IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Antech Diagnostics, Inc.,                  Case No. 3:14CV146

         Plaintiff

      v.                                  **ORDER**

Gary Thompson, et al.,

         Defendants

This is a breach-of-contract suit between a veterinarian and the animal hospitals he controls and a company that provides laboratory services to veterinarians

The defendant, Dr. Gary Thompson, agreed to use Antech Diagnostics, Inc., as the sole provider of "all veterinary diagnostic and clinical laboratory services" his hospitals required. (Doc. 1-1 at 3). He also agreed to purchase at least $300,000 worth of services from Antech during the contract's five-year term.

Six months after executing the contract, however, Thompson had not purchased any lab services from Antech. When Antech sued for breach of contract, Thompson counter-claimed that Antech breached the contract by failing to provide lab services that integrated with the hospitals' practice-management software.

Jurisdiction is proper under 28 U.S.C. § 1332(a)(1).

Pending is Antech's motion for summary judgment. (Doc. 33). For the following reasons, I deny the motion.

**Background**

Dr. Thompson is a shareholder in three animal hospitals in Toledo and southeastern Michigan.

In the course of his practice, Thompson kept electronic medical records and used a computer program – IDEXX Cornerstone Practice Management Software (Cornerstone) – to merge his patients' lab results with their medical records. According to Dr. Thompson, this integration function was critical because, "without it, the lab results would have to be entered into the electronic medical records manually, which is inefficient and requires manpower and labor expenses." (Doc. 28-1 at ¶3).

An Antech Sales Manager, Sean Hayes, approached Thompson in 2012 about using Antech's lab services in his hospitals.

On "multiple occasions" during their negotiations, Dr. Thompson told Hayes his hospitals used Cornerstone software and kept electronic records. (*Id.* at ¶4). Hayes assured Thompson that "Antech's lab services module would also integrate lab test results with both the electronic medical records" and the Cornerstone software. (*Id.* at ¶5).

That assurance in hand, Thompson executed a "Lab Services Agreement" with Antech in December, 2012. (Doc. 1-1 at 2).

The contract provided that Thompson would "cause all veterinary diagnostic and clinical laboratory services ("**Laboratory Services**") that are to be performed for and on behalf of [his hospitals], to be performed by . . . Antech." (*Id.* at 3) (emphasis in original). Thompson also agreed to purchase at least $60,000 of services from Antech during each year of the contract's five-year term.

Dr. Thompson testified that his hospitals tried to use Antech's lab services, but, "contrary to what was promised by Antech, Antech could not provide for the requisition of lab tests or the integration of lab test results into the electronic medical records" or the Cornerstone software. (Doc. 28-1 at ¶7),

In early January, 2013, another Antech Sales Manager, Sarah Silage, notified Dr. Thompson that Antech was "going to postpone your start up with Antech services until you all have the new 8.3 Cornerstone [software update] installed with the [Antech] laboratory module." (Doc. 33-5 at 2).

In mid-January, Silage emailed Thompson's office with instructions how to purchase "the Antech lab module through Cornerstone." (Doc. 28-1 at ¶9). But when the hospitals tried to download the Antech module, Thompson learned it "was still in beta testing and would not be done for quite some time." (*Id.* at ¶10) (internal quotation marks omitted).

The record is silent about the parties' dealings, if any, between mid-February and mid-May, 2013.

On May 17, Silage emailed Thompson's staff to "pass along some information that [she] just received about the Cornerstone update." (Doc. 33-8 at 2). She then asked Thompson to "let [her] know when might be good (after your install and update of course) to go ahead and setup your start up in-service scheduled." (*Id.*). Soon thereafter, Hayes told Thompson that, "after a long wait for [Cornerstone] 8.3 we are finally able to get started." (Doc. 33-9 at 2).

When Dr. Thompson tried to install the Cornerstone update in June, 2013, his computer servers crashed. "We are on hold," Thompson told Antech, "until we get our technical issues sorted out[.]" (Doc. 33-11 at 2).

3

The record shows that, in early June, Dr. Thompson had contracted with IDEXX – the developer of the Cornerstone software – to obtain needed laboratory services. According to Thompson, he entered the contract only "[b]ecause Antech failed to provide, and could not provide, the lab services [it had previously] agreed to [provide.]" (Doc. 28-1 at ¶12).

In August and September, 2013, Antech representatives contacted Dr. Thompson to secure a "start date" for the company "to start lab services." (Doc. 33-11 at 3). It does not appear Thompson or his staff responded to these queries. Instead, Thompson told his office manager that "[w]e need to get an address and send back the [lab payment] certificates." (Doc. 33-12 at 2).

In November, 2013, Antech brought this suit for breach of contract. It seeks to recover $205,567.16 in lost profits resulting from defendants' failure to purchase lab services.

After I denied Thompson's and the hospitals' motion to dismiss, *Antech Diagnostics, Inc. v. Thompson*, 2014 WL 3909529 (N.D. Ohio), the defendants counter-claimed for breach of contract.

They alleged the contract obligated Antech to provide lab services that could integrate with the hospitals' practice-management software (*i.e.*, the Cornerstone software), and that Antech's failure to offer integrated services was a material breach. Thompson and the hospitals seek $60,000 in damages, which represents the additional cost they paid to obtain lab services from IDEXX.

## Discussion

Summary judgment is appropriate under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323.

Once the movant meets that initial burden, the "burden shifts to the nonmoving party [to] set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

I accept the non-movant's evidence as true and construe all evidence in its favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

### A. Meaning of "Laboratory Services"

To prevail on its breach-of-contract claim, Antech must prove "(1) the existence of the contract, (2) [its own] performance or excuse for nonperformance, (3) defendant[s'] breach; and (4) the resulting damages to [Antech.]" *Oasis West Realty, LLC v. Goldman*, 250 P.23d 1115, 1121 (Cal. 2001).[1]

The principal issue in dispute, at least for present purposes, is whether Antech performed its obligations under the Lab Services Agreement. That issue, in turn, depends on what obligations Antech agreed to undertake.

According to the contract, Antech was to be the defendants' exclusive provider of "Laboratory Services" for sixty months, beginning in December, 2012. (Doc. 1-1 at 1). The agreement defined "Laboratory services" as "all veterinary diagnostic and clinical laboratory services" Thompson and his hospitals required. (*Id.* at 2).

---

[1] A choice-of-law provision in the Lab Services Agreement states that California law governs any dispute over the contract's meaning.

Antech contends this language is unambiguous and did not require it to ensure integration with the hospitals' computer software. The company's position appears to be that, by agreeing to provide "Laboratory Services," it agreed to perform only the actual lab work the hospitals required.

Thompson and the hospitals contend the language is ambiguous.

They note that, while the contract defines "Laboratory Services," it does so only by reference to "clinical and diagnostic laboratory services," and that the latter term is itself undefined. The defendants also argue that, in the parties' dealings and in the veterinary industry more broadly, the term "services" includes "the ability to do a lab requisition to request the testing and the ability to integrate [the test results] into the electronic medical records." (Doc. 34 at 14).

Under California law, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting[.]" Cal. Civ. Code § 1636.

"When a dispute arises over the meaning of contract language, the first question . . . is whether the language is reasonably susceptible to the interpretation urged by the party." *Horath v. Hess*, 225 Cal. App. 4th 456, 464 (2014). "If it is not, the case is over." *Id.* "If the court decides the language is reasonably susceptible to the interpretation urged, the court moves to the second question: what did the parties intend the language to mean?" *Id.*

"Whether the contract is reasonably susceptible to a party's interpretation can be determined from the language of the contract itself or from extrinsic evidence of the parties' intent." *Id.*

Here, each side has offered a reasonable interpretation of "Laboratory Services."

As Antech notes, nothing in the contract speaks explicitly to integrating Antech's services with the defendants' practice-management software.

6

Moreover, part of the contract implies that "Laboratory Services" means only those services Antech would perform in one of its labs. Here I emphasize the language in § 1.1 of the contract imposing on Dr. Thompson the obligation to "cause all . . . **Laboratory Services**" that his hospitals required "to be performed by a veterinary diagnostic laboratory owned by Antech." (Doc. 1-1 at 3) (emphasis in original).

In contrast to the services that Antech would perform in one of its labs, the integration functions – requesting lab tests via the Cornerstone software and merging test results into the hospitals' electronic records – are seemingly tasks that Thompson's staff would perform in-house.

These considerations tend to support Antech's claim the contract did not require it to ensure integration with the hospitals' Cornerstone software.

On the other hand, the contractual definition of "Laboratory Services" is tautological: it defines "Laboratory Services" as "all veterinary diagnostic and clinical *laboratory services*" that Thompson's hospitals required. Given that the key contractual term is essentially undefined, the fact that the contract does not expressly refer to integration functions is of less importance.

Furthermore, before the parties executed the contract, an Antech Sales Manager represented to Dr. Thompson that "Antech's lab services module would . . . integrate lab test results with both the [hospitals'] electronic medical records" and the Cornerstone software. (Doc. 28-1 at ¶5). This supports defendants' claim that the parties intended "Laboratory Services" to encompass integration with the hospitals' practice-management software.

Finally, the defendants point to statements Antech or its agents made suggesting "Laboratory Services" is not limited to actual testing. As just noted, an Antech Sales Manager told Dr. Thompson

7

that its lab services would fully integrate with the hospitals' practice-management software. Moreover, a statement on Antech's website distinguishes between "services" and "tests":

> We oversee and guide veterinarians on all aspects of our laboratory system from proper specimen collection, to test request form completion, to the reporting of results. Acting as an extension of your veterinary business, we also provide our network of veterinarians with peer-to-peer consulting services at no additional charge.

http://goo.gl/1tjqeE.

For these reasons, I conclude that the term "Laboratory Services" is ambiguous as a matter of law. *Cf. Winet v. Price*, 4 Cal. App. 4th 1159, 1165 (1st Div. 1992) (whether contract is ambiguous is a question of law). Because there is conflicting evidence on whether the parties' intended that term to encompass integration with defendants' practice-management software, summary judgment is unwarranted.

## B. Breach

Just as a reasonable jury could come to different conclusions as to the contract's meaning, so too could it reach different conclusions as to whether Antech performed its obligations.

If the jury were to find Antech was responsible for integrating its lab services with defendants' computer software, there is sufficient evidence for the jury to conclude Antech failed to satisfy that obligation.

Dr. Thompson testified that, immediately after executing the contract, his hospitals tried, but were unable, to obtain "requisition of lab tests or the integration of lab test results" from Antech with their existing software. (Doc. 28-1 at ¶7). Antech then unilaterally "postpone[d]" the hospitals' "start up with Antech services" until they obtained "the new 8.3 Cornerstone" software update, thereby by denying the hospitals any access to Antech services. (Doc. 33-5 at 2).

The hospitals then endured further delays in obtaining the update, such that, by June, 2013, they were still could not use their practice-management software to requisition lab work from Antech and integrate the results of such tests into their existing medical records.

This evidence, taken as true and in a light most favorable to defendants, would support a jury verdict for the defense. Antech is not entitled to summary judgment. *Consol. World Invs., Inc. v. Lidio Preferred Ltd.*, 9 Cal. App. 4th 373, 380 (1992) ("It is elementary a plaintiff suing for breach of contract must prove it has performed all conditions on its part or that it was excused from performing.").[2]

## Conclusion

It is, therefore

ORDERED THAT: Antech's motion for summary judgment (Doc. 33) be, and the same hereby is, denied.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge

---

[2] The defendants have raised other arguments in opposition to summary judgment (Doc. 34 at 17-23) that I need not address, given my ruling that this case must go to trial.